UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT TACOMA

_____

JAMES FALLS, individually          ) 2:21-cv-00922-JCC-
and on behalf of other             ) TLF
persons similarly situated,        )
                                   ) Tacoma, Washington
                 Plaintiffs,       )
                                   ) June 29, 2022
v.                                 )
                                   ) Motion Hearing
SOULBOUND STUDIOS, LLC;            )
SOULBOUND STUDIOS (USA); and       )
DOES 1 through 50,                 )
                                   )
                 Defendants.       )

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE THERESA L. FRICKE
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

 For the Plaintiff:       EVAN M. SELIK
                          McCathern Shokouhi Evans Grinke
                          523 West Sixth Street
                          Suite 830
                          Los Angeles, California


 For the Defendant:       TIMOTHY B. FITZGERALD
                          ANNA F. CAVNAR
                          McNaul Ebel Nawrot & Helgren PLLC
                          600 University Street
                          Suite 2700
                          Seattle, Washington


Proceedings stenographically reported and transcript
produced with computer-aided technology

MORNING SESSION

JUNE 29, 2022

THE CLERK:  United States District Court for the Western District of Washington is now in session, the Honorable Theresa L. Fricke presiding.

MR. FITZGERALD:  Good morning, Your Honor.

THE COURT:  Good morning.  This is James Falls versus Soulbound Studios, case number 21-922.  Would the parties please introduce yourselves for the record, starting with plaintiff's counsel.

MR. SELIK:  Good morning, Your Honor.  My name is Evan Selik, and I represent the plaintiff in this matter.

MR. FITZGERALD: Tim Fitzgerald on behalf of defendant.  I am joined by my colleague Anna Cavnar as well.

THE COURT:  This is on the Court's calendar for a motion to dismiss.  15 minutes per side.  I understand that the moving party, the defense, has requested rebuttal time, three minutes; is that correct?

MR. FITZGERALD:  That is correct, Your Honor.

THE COURT:  All right.  The defense may begin.

MR. FITZGERALD:  We are here on Soulbound Studios' motion to dismiss under Rule 12(b)(6).  The question before the Court is whether the plaintiffs have stated a plausible claim for relief.

In cases like this one, where the claims turn upon the

meaning of an agreement, it is proper for the Court to examine whether the claims are plausible in light of the entire agreement, including any language the plaintiffs may have neglected to mention in its pleadings.

If the answer to that question is "no," then the claims must be dismissed.

We respectfully submit that this case must be dismissed. When reading the entire agreement between the parties, plaintiffs cannot state any plausible claim for relief.

Let me start with the breach of contract claim.  The Soulbound terms of use expressly state that Soulbound Studios is not responsible for refunds.  That language can be found in Sections 5 and 7 of the SBS terms, which are attached to our motion as Exhibit A.

I am not going to belabor that language.  Let me just read one excerpt from Section 5 that I think sufficiently makes the point.  Here is what it says:  "In consideration of Soulbound Studios' use of best efforts, you agree any amounts raised shall be non-refundable, regardless of whether or not Soulbound Studios actually delivers the services."  In this context, "the services" means the game and downloadable content.

As we pointed out in our motion, similar refund disclaimers are repeated throughout the SBS terms.

Through this lawsuit, plaintiff is asking the Court to

disregard that clear contractual language and to go one step further by imposing the very obligation those provisions expressly disclaim.

Importantly, plaintiff doesn't point to any language that says Soulbound Studios has such an obligation.  He is asking the Court to imply such an obligation.  If you look at Paragraph 31, Page 10 of his Amended Complaint, he says exactly that.  Plaintiff says he is seeking to enforce what he describes in that paragraph as "a written contract with implied provisions."

I want to pause on that term "implied provisions." Plaintiff is saying the Court should read into the contract something even he admits is not actually there.  If the Court is being asked to imply unwritten provisions into a written contract, it becomes all the more important to carefully review the terms that are written down.

What does the rest of the agreement say about refunds? What about the sentences directly before and the one directly after the one on which plaintiff relies?  That's a highly relevant question, Your Honor.  It is one that plaintiff carefully avoids in his Amended Complaint.  That's because the remaining balance of Section 5, together with Section 7, expressly state that Soulbound Studios is not responsible for refunds.  That's exactly the opposite of what he is asking this Court to imply.

Courts, of course, cannot rewrite contracts by implying additional terms that contradict the ones to which the parties agree.  The parties agree that this Court must give effect to all the contract's terms and cannot render some of the language meaningless or ineffective.  We cite the exact same case law on that point.

Respectfully, that's exactly what the plaintiff is asking this Court to do. If adopted by this Court, plaintiffs' interpretation of the agreement would negate the express refund disclaimers to which the parties agree and that would render them meaningless, ineffective.  That interpretation of the agreement is implausible on its face and inconsistent with Washington law.  It must be rejected.

What does plaintiff say in response?  He tries mightily to navigate around these 40 issues.  He isolates a single sentence from Section 5 and asks the Court to dramatically change the meaning of that sentence by grafting supposedly implied provisions onto the end of it.  He ignores the remaining balance of Section 5, all of Section 7, all which directly contradict what he's asking this Court to do.

The sentence on which plaintiff relies is worth reading a few times because it certainly does not say what he claims.

Here is what that sentence says:  "Any portion of funds raised for the provision of services shall be non-refundable unless such funds shall be deemed refundable under the terms

of service of the third-party services to which those funds for provision of services were procured."

According to the plaintiff, that sentence requires my client, Soulbound Studios, to honor refund policies that might be adopted by third-party service providers.

The language he cites, which I just read, doesn't say that. It doesn't say anything close to that.  In fact, that sentence doesn't reference Soulbound Studios at all.

Plaintiff is asking the Court to imply that this sentence imposes refund obligations on Soulbound, even though all of the surrounding language expressly and categorically says the opposite.

There is one other point I want to make here.  It is notable that nearly every other sentence of Section 5 references Soulbound Studios by name and always in the context of disclaiming refund liability.

By contrast, the single sentence on which the plaintiff relies doesn't mention Soulbound Studios at all.  That's because that sentence isn't talking about Soulbound Studios. That sentence simply acknowledges that refunds may be available, if at all, through third-party service providers, just as it says.

Now if that sentence had imposed a refund obligation on Soulbound, as plaintiff says it does, that sentence certainly would have mentioned Soulbound Studios by name.

The fact that virtually every other sentence in Section 5 refers to Soulbound by name, always in the context of disclaiming refund liability, the one sentence plaintiff invokes does not.  That's powerful evidence that the third-party refund language that he's talking about applies only to third parties.  Respectfully, there is no basis for this Court to imply otherwise.

Finally, contrary to plaintiffs' assertion, the sentence on which he relies peacefully co-exists with the remaining balance of the SBS terms.  "Refunds might be available from third-party service providers," as indicated in the single sentence he cites in his Amended Complaint, but "refunds are not available from Soulbound Studios," as indicated in the remaining balance of Section 5 and Section 7.  Those provisions are perfectly consistent with one another and must be enforced.

Plaintiffs' allegations to the contrary are not plausible. His contract claims should be dismissed.

Let me shift gears and spend a couple minutes on the CPA. The first point I want to make is that causation, of course, is a necessary element under the CPA in Washington's seminal CPA case, which I know Your Honor is very familiar with, *Hangman Ridge.*  The Washington Supreme Court stated, and I quote, "a causal link is required between the unfair or deceptive acts and the injury suffered by the plaintiffs."

That's the causation standard.

Plaintiffs' CPA claim should be dismissed because he cannot plausibly plead that necessary element of causation. What he alleges with very little detail is that the Studio released an announcement that supposedly included cinematics instead of game play footage.  You don't have to get into the nuance of what all of that means.  He is saying the video was unfair and deceptive.  Notably, he doesn't answer the important question of when he purchased downloadable content. Did he do so before or after the supposedly misleading video was released?  It is a simple timing question, Your Honor.

If he purchased downloadable content before the supposedly misleading video was released, logically that video could not have caused him to make those purchases.

We pointed this out in our opening motion, that plaintiff completely failed to address it in response. He danced around it.  I say that with all due respect.  Rather than telling us when he purchased downloadable content, he simply says he learned the video supposedly contained cinematics and not game play after having watched the video.  That doesn't answer the question.

The issue is whether he watched the video before or after making his purchases.  In other words, whether the supposedly misleading video even arguably caused him to make those purchases.  As I said, it is a simple timing issue and it's a

gaping hole in his Amended Complaint, and he hasn't addressed it.

Plaintiffs' CPA claim fails for that reason, and for one other reason:  The SBS terms explicitly state, and I am reading now, "the game may differ in certain aspects from game footage shown or described at the time of purchase."

It is neither unfair nor deceptive for a party to do exactly what it tells its consumers it might do in its terms of service. Therefore, even if plaintiff could establish the necessary element of causation, and we respectfully submit he can't, his CPA claim still fails because the terms of service disclose the very circumstances he now claims were concealed from him. His allegations on that point are not plausible in light of the entire agreement that he alludes to in his Complaint.

I am going to touch on unjust enrichment just very briefly. There is no dispute that the SBS terms are a valid and enforceable contract.  The plaintiff is judicially estopped from saying otherwise because he's suing under the SBS terms.

The law in this district is crystal clear. Unjust enrichment cannot be pleaded in the alternative where a claim for relief rises and falls on the language of a valid and enforceable contract. We have cited the case law on that in our papers.

The fact that the Court might reject plaintiffs' interpretation of the SBS terms does not change the fact that the SBS terms are indisputably a valid and enforceable contract.  The plaintiff can't end run the agreement by asserting a quasi contractual claim.  The law on that is very clear.

Declaratory judgment I am not going to talk about unless Your Honor wants to hear about it because I think it is completely subsumed by the contract claim.

On the class allegations, in the interest of time, I am happy to rest on the papers on that issue, unless, of course, the Court has specific questions that I can address. Otherwise, I am going to stop now.  Hopefully, I am within my time limits.  I am happy to answer questions.

THE COURT:  Counsel, what is your position on whether the contract between James Falls and Soulbound was connected with the contract between James Falls and Xsolla?

MR. FITZGERALD:  Those contracts are not connected, Your Honor.  As we have said in our papers, the reference to a third-party service provider's refund policy is really kind of stated almost in the abstract in the SBS terms.  The language that talks about that is merely an acknowledgement that such a policy may be out there.

What you see in the Complaint is kind of a linear narrative about how Mr. Falls navigated the SBS website, and

then onto the website of the payment process or the publisher of the game; it is a third party called Xsolla.

I think these terms of service were written with that in mind. The Studio is not publishing the game, right? There is going to be interaction between these companies.

The language at issue here reflects that, right, saying you are dealing not just with one party, but with some other party. We are not offering refunds, but the other party you are dealing with might. That's what that language in the contract reflects.

THE COURT: Your contention, then, is within the definitions in Part 2 of the contract between Soulbound and James Falls, the definition of "Soulbound Studios" excludes a third party like Xsolla whose sole purpose was to facilitate payment; is that correct?

MR. FITZGERALD: That is correct.

THE COURT: Right. You can reserve the rest of your time for rebuttal. I will hear from plaintiff.

MR. SELIK: Thank you, Your Honor. I appreciate it. Appreciate the time.

I want to focus mainly on what Your Honor's question just hit on, which is what kind of the main focus of my argument was going to be, which is: Section 5 of the agreement specifically refers to an outside party, and that they will -- quote/unquote, "the services shall be non-refundable

unless deemed refundable by the terms of services of the third party." Okay. The third party here is Xsolla.

Let's put this into real life terms. You go -- Mr. Falls and the rest of the class goes to Soulbound Studios, which is alleged in the Complaint, and goes to seek downloadable content. They go online and find the downloadable content. They are switched over to Xsolla to pay for the content. Xsolla takes the money, and we have alleged in the Complaint that about six million of that money went to SBS, Soulbound Studios. Soulbound Studios takes the money and creates the game. That's the impression we are given.

Once Xsolla -- once Soulbound Studios doesn't create that game, it is when Mr. Falls and these people start requesting refunds. Now, to get those refunds back, where does Xsolla have to go? To Soulbound Studios to get that money to give it back because Xsolla doesn't have that money. The reason they don't have that money is because they gave it to Soulbound Studios so Soulbound Studios could prepare and develop this Chronicles of Elyria game.

There is a conjunction here and there is really an interplay between the two parties and the two agreements. Okay?

When Soulbound Studios states that they don't -- they don't have to refund anything, that makes Xsolla now -- the full portion of the refund has to come from them, when they

don't have the money.  They are not the people that retain the money.  They are, just as counsel said and as they argue in their papers, just a payment processer. Soulbound Studios has to be able to provide the refund, which is why Section 5 exists and why the interpretation and why we are asking the Court to interpret that as -- to honor that refund policy that Xsolla provides because that's what Section 5 says. They won't provide refunds unless a third party will, because they know that third party has to come back to them and ask for the money so they can refund it because it is not Xsolla's obligation to provide money back to the consumer that they don't have.

I want to briefly talk about the causation issue with the CPA.  In Section 8 of the Amended Complaint -- excuse me -- Paragraph 15 of the Amended Complaint, we go through pretty painstaking detail about how -- the reason for the game play as opposed to cinematics of why it is important and why it boosts confidence.

If the Court wants a timeline of when this happened, we can provide that in the Amended Complaint.  It is very important to understand the difference between cinematics and game play.  It is crucial because as we state in the Complaint, "game play shows that the game is actually being developed." It boosts confidence.  It allows Mr. Falls and the rest of the class to say, hey, I just purchased this

downloadable content, and I saw this and now I am going to purchase this downloadable content.  They are making the game, instead of cinematics, which is you and I going to a theater battling it out in swords and sending it out to everyone across the world.  It is a very different delineation.  That's the reliance and the causation that works for the CPA.

I want to discuss a point that wasn't raised in the argument but briefed in the papers, but it is the idea of deception and the idea of the -- that Soulbound Studios has to be deceptive in their production of this game and in their representation.  That's not what we are alleging here.

We are not alleging that Souldbound Studios had an intentional act to deceive.  We are alleging they had the capacity to deceive based on their conduct.  I think we cited the cases in our papers that show to get over the misrepresentation and to get into the CPA, you just have to allege the capacity to deceive and not actually have the intent to deceive, as the plaintiffs allege.

As for the class allegations, I want to just briefly touch on the fact that this wouldn't be a time to even discuss class allegations based upon the lack of discovery and things that plaintiff hasn't done yet.

There is a broader issue here that, if the Court finds and interprets the contract the way that we have outlined it, it

is one set of facts for all of these plaintiffs, for all the putative class because we are talking about all the consumers who went to SBS that got converted over to Xsolla, which is everybody that purchased the downloadable content.  If they are subject to the same policy -- refund policy that we believe SBS has that refers to Xsolla and that Xsolla honors, they would all be under the same set of facts and this would be -- a class allegation would be sufficient for the motion to dismiss.

THE COURT:  Counsel, if the Court were to find that the defendant's contract was clear about a no refund policy, then does that mean all of the claims go down?

MR. SELIK:  I think so.  I think so because the deception is based upon the idea that there was a refund policy.  The CPA would fall as well.

I am thinking through this, Your Honor.  Give me a moment. I think the breach of contract for sure.  I think the CPA. Declaratory relief, which is asking for the future, yes, I think it would.  It would take care of the entire Complaint. As much as I hate to capitulate to that, it would, but I don't think that is the interpretation the Court should take of this.

THE COURT:  As far as the contracts that are incorporated by reference into the Amended Complaint, do you agree that all of the contracts that have been provided in

Docket 55-1 -- so there is Exhibits A through D.  I realize they had different exhibit numbers in the middle of the page than they do on the left lower part of the page, but for purposes of this lawsuit, it would be the Exhibits A through D, and so that includes the contracts from both Soulbound Studios and Xsolla.  All of that is incorporated by reference into the Amended Complaint, correct?

MR. SELIK:  The only contracts incorporated into the Amended Complaint would be Soulbound's contract because we are suing under that, and the reference to Xsolla's contract because that is the specific policy that Soulbound relies upon for the return.

The other things that are attached -- and we object to it in our opposition -- are Exhibit B, which is the declaration of Mr. Walsh that has no place in our Complaint and has no place in a motion to dismiss when it is based on the papers.

We -- plaintiff has objected and briefed that objection on Page 16 of our opposition about the affidavit.

Exhibit B, we objected to and don't believe the Court should even warrant considering it because it is a declaration of, I think, the owner of Soulbound Studios, as well as the photographs attached to that declaration.  Those have no place in the motion to dismiss.  They are not judicially noticed.

Let's see the other exhibits I am scrolling through,

Your Honor.

THE COURT:  The attachment to Exhibit -- Exhibit B is actually inclusive of the Souldbound October 2016 version of their contract.  Are you saying that version of the contract is not something that is incorporated by reference, only the version that is the May 2018 version?

MR. SELIK:  Correct.

THE COURT:  Is it your contention that the Soulbound contract between your client and Soulbound, that is a contract that is connected with the Xsolla contract?

MR. SELIK:  Correct.

THE COURT:  Are you saying they are connected, so essentially it is all one contract?

MR. SELIK:  I am not saying it is connected and all one contract.  I am saying specifically Section 5 references the third-party servicer and specifically says the third-party services allows a refund.  It is very clear Section 5 doesn't say "they will refund it for you."  It doesn't say -- doesn't say "we will refund it for you."  It is very ambiguous.  I think purposely so.  That is why the refund has to come from Soulbound, which I discussed earlier, is because Xsolla doesn't have the money.  They give it to Soulbound, because that's how they make their game.  How is Xsolla supposed to refund money that they don't have because they have given it to Soulbound?  They are a payment

processer.

THE COURT:  The contract that would -- assuming there is a written contract between Soulbound and Xsolla, that's a separate contract.  Your client is not -- that's not part of this lawsuit, is it?

MR. SELIK:  That is correct.  There may be some indemnity agreement and contribution.  I don't know what is going on, what the agreement looks like.  Hopefully in discovery, if this goes there, I can get that.  I don't know what that looks like.  You are correct, it is not something that my client, Mr. Falls, is alleging he is a part of because I think it is clear in what we argue in our papers and the Complaint is the connection is through Section 5, which loops in Xsolla as the third-party servicer to provide that SBS, Soulbound, will provide that refund.

THE COURT: Anything else you wish to make a statement about for the record before I turn back to the defense for their rebuttal?

MR. SELIK:  No, Your Honor. I appreciate the time.  I know you have read through the papers, so thank you very much.

THE COURT:  All right.  I will hear from the defense in rebuttal.

MR. FITZGERALD:  Just a couple of minutes.  On the exhibit question, I just want to point out this case has a

fairly extensive history for being at a motion to dismiss stage.  This is actually the second motion to dismiss.  All of the documents that we put in the record in connection with this motion I believe were already in the record from the prior motion to dismiss.  I might be wrong about it.  I see Mr. Selik shaking his head.  I think he is an honest man and I take him at his word if he says I am wrong.

There were a number of documents that were previously in the record.  What we put in was Mr. Walsh's declaration from the prior motion.  The Court will do with that as it may, but I wanted that to be clear.

On the contract claim, Mr. Selik stated that Xsolla doesn't have refund money, and it must obtain money from Soulbound Studios.  I want to point out that plaintiff is actively suing Xsolla, like right now.  He initially made Xsolla a party to this lawsuit and that claim was dismissed because of an arbitration provision.  He is actively suing Xsolla on a parallel track with this lawsuit against Soulbound Studios.  It is not a situation where it is, do I get the refund here or do I get the refund there.

He is seeking a double recovery, Your Honor.  He is asking the Court to interpret the contract in a way that lets him do that.  That is yet another reason why this interpretation of the agreement is just implausible on its face.

One more point about Xsolla and Soulbound.  Xsolla is a

large company.  It is not a publisher for just this one studio.  It has lots of clients.  It is a well-known company in the industry.

My client is a tiny video game studio that is trying in kind of a hand-to-mouth kind of way to get this game going. It raises money, subject to all the disclosures that are in the terms of service, and uses the money to develop the game. This idea that Soulbound has the money, and not Xsolla, is just completely untenable.

Lastly on the contract claim.  If my client is bound by Xsolla's terms, as Mr. Selik says, this case has to be dismissed for another reason.  It has to be referred to arbitration just like the claims plaintiff is currently suing against Xsolla.  If those are the terms that we are under, even in part, that's a claim that has to be arbitrated.  The court in California already concluded that and actually dismissed the claim against Xsolla for that reason.  The same outcome would apply here, if that's the way the contract is interpreted.

Lastly, on the CPA, Mr. Selik says that he will give the Court a timeline of when his client purchased downloadable content.  That's really, really important.  It addresses the timing issue we talk about in our motion.

I want to point out, he still hasn't given us the timeline.  He has had a long time to do it.  He could have

done it in opposition to our motion.  He hasn't.  I would respectfully suggest that if Mr. Selik could tell us right now whether his client purchased downloadable content before or after the supposedly misleading video was released, that would save everybody a lot of time and money.

I am happy to answer any further questions, Your Honor.

THE COURT:  Counsel, would you agree with the statement that if the Court finds the contract between Souldbound and James Falls is clear and there would be no refund under the plain language of the contract, then the entire lawsuit goes down?

MR. FITZGERALD:  Unquestionably, yes.

THE COURT:  For purposes of this arbitration that is taking place between Xsolla and James Falls, is there any reason that these two lawsuits would need to sort of have any sequencing?  In other words, should this Court be doing anything with this case while we are waiting for the arbitration to finish?  Or is your contention that that is such a separate contract there is no reason to even look at what is happening with that arbitration?

MR. FITZGERALD:  Yes, that, but there is another piece of this, which is, you know, my client, it is a business entity.  It is a business entity that is run by human beings.  These are people with families, homes, spouses.  They have to live with this.  They have articulated

in their motion why this claim lacks merit, why it is implausible, and just at a human level I think they are entitled to have a ruling on the motion sooner rather than later.  If the Court thinks otherwise, I am not totally opposed to the idea of sequencing.  I think for a lot of reasons it makes sense to address this issue.  I don't think there is anything about the Xsolla case that would logically or legally preclude the Court from doing that.

THE COURT:  If the Court found that the Soulbound contract is clear on the face of the contract and does not offer a refund, then is there any need for the Court to offer leave to amend for any purpose?

MR. FITZGERALD:  I don't believe there is, Your Honor.  Mr. Selik certainly hasn't given me any indication as to why that conclusion should be any different. I don't see any reason.

THE COURT:  As you were asking about the timing of the trailer and the allegations about when did the plaintiff make the purchase in relation to when that trailer came out, is that a potential reason that the Court would need to grant leave to amend?

MR. FITZGERALD:  On that argument, maybe.  As I said earlier, the CPA claim really fails for two reasons.  I think the two reasons are independently sufficient.  The causation issue certainly warrants dismissal.  If Mr. Selik can tell us

that the timing issue is in fact not an issue, okay, okay, I get that.

As I said in our motion, and I have also said it today, the SBS terms explicitly state, and I will read it again: "The game may differ in certain aspects from game footage shown or described at the time of purchase."

As I said earlier, it is not a violation of the CPA to do exactly what you are talking about in your terms of service. That is kind of like quintessentially what a CPA violation is not.

THE COURT:  I think I have heard all the answers I needed to hear after reviewing all the materials.  I appreciate your thoroughness with briefing and argument.  I will take this under advisement and issue a report and recommendation very soon.

MR. FITZGERALD:  Thank you, Your Honor, appreciate it.

THE COURT:  Any other matters the parties wish to raise before I close the hearing?

MR. FITZGERALD:  None for defense, Your Honor.

MR. SELIK:  No, Your Honor.  Thank you.

THE COURT:  That concludes this hearing.  The Court is now in recess.

(The proceedings adjourned.)

C E R T I F I C A T E


        I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.



*/s/ Angela Nicolavo*

ANGELA NICOLAVO
COURT REPORTER